Jerome J. SCALISE, et al.,
Plaintiffs–Appellees,

v.

Richard THORNBURGH, et al.,*
Defendants–Appellants.

No. 88–2497.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1989.
Decided Dec. 19, 1989.

General, pursuant to Fed.R.App.P. 43(c)(1).

Sidney Z. Karasik (argued), Anne M. Burke, Chicago, Ill., for plaintiffs-appellees.

Thomas P. Walsh, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., Barbara L. Herwig, Irene M. Solet (argued), Dept. of Justice, Civil Div., Appel-

late Section, Washington, D.C., for defendants-appellants.

Before WOOD, Jr., COFFEY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In this appeal, the Attorney General contests the district court's conclusion that § 4102(4) of the Transfer of Offenders To and From Foreign Countries Act, P.L. No. 95–144, 91 Stat. 1212, 18 U.S.C. §§ 4100 *et seq.* (1977) ("the Act"), requires him to issue substantive regulations governing his exercise of discretion in international prisoner transfer decisions. By virtue of this initial determination, the district court deemed it proper to exercise "mandamus jurisdiction" under 28 U.S.C. § 1361 compelling the Attorney General to promulgate such regulations. 687 F.Supp. 1239. This initial determination also served to underpin the district court's exercise of jurisdiction under § 701(a)(2) of the Administrative Procedure Act, 60 Stat. 237, 5 U.S.C. §§ 701 *et seq.* (1946), in reviewing the Attorney General's decision not to promulgate such regulations. Finally, the district court concluded that § 4102(4) of the Act raised a liberty interest under the due process clause that was violated in these proceedings by the Attorney General's denial of plaintiffs' transfer request. In that we conclude that the Attorney General is not required under § 4102(4) to issue substantive regulations governing his discretion in international prisoner transfer decisions, we reverse the district court's grant of summary judgment and remand for proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

Plaintiffs below, Jerome Scalise and Arthur Rachel, are United States citizens. In 1980, they committed an armed robbery of a jewelry store in London, escaping with jewels worth $3.6 million, including the famous Marlborough diamond. Scalise and Rachel were arrested and subsequently convicted in the United Kingdom of robbery and possession of a firearm with intent to commit an indictable offense in violation of the United Kingdom's 1968 Theft Act and Firearms Act of 1968.[1] Each was sentenced to 15 years in prison in the United Kingdom with the sentences to commence on August 6, 1984. Plaintiffs, however, do not wish to remain in England during their terms of incarceration.

On July 1, 1985, the United States and the United Kingdom ratified the Convention on the Transfer of Sentenced Persons ("the Convention"). This treaty provides for the transfer of foreign prisoners from the country of their incarceration to their home countries. Under the Transfer of Offenders To and From Foreign Countries Act, the Attorney General is granted the authority to implement the Convention.[2] Specifically, under § 4102(4) of the Act, "[t]he Attorney General is authorized ... to make regulations for the proper implementation of such treaties in accordance with this chapter and to make regulations to implement this chapter...."

After the Convention went into effect, Scalise and Rachel sought transfer to the United States under its terms. The Attorney General refused to approve their request. In a letter to plaintiff's counsel, the Department of Justice, acting on behalf of the Attorney General, explained:

> The principal factors we took into consideration in making the decision not to request Mr. Scalise's transfer were: the relative seriousness of his offense; his extensive criminal record; the manner of

1. Prior to their capture, however, Scalise and Rachel successfully arranged for the jewels to be mailed to the United States. To the best of this court's knowledge, these jewels have not yet been recovered by the British authorities.

2. Even though the Act was passed prior to the effective date of the Convention, all parties to this case agree that the provisions of the Act govern the Convention. *See* 18 U.S.C. § 4101(k) ("treaty" means a treaty under which an offend-

er sentenced in the courts of one country may be transferred to the country of which he is a citizen or national for the purpose of serving the sentence); H.Rep. No. 95–720, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 3146, 3146 ("the purpose of the act is to provide the implementation procedures for offender transfer treaties with Mexico and Canada as well as for similar future treaties").

his return to the United Kingdom; his "A" security classification in the United Kingdom, the highest security category; and, the likelihood that a transfer would not further his rehabilitation.

On September 11, 1988, Scalise and Rachel filed this action in federal district court seeking a writ of mandamus or, alternatively, a mandatory injunction to compel the Attorney General to seek their transfer and to issue substantive guidelines for his administration of the Convention. In a subsequent motion for summary judgment, Scalise and Rachel alleged that the Attorney General had breached a mandatory duty under § 4102(4) of the Act to publish regulations establishing standards for his review of prisoner transfer requests under international treaties. Scalise and Rachel further alleged that they had a liberty interest entitling them to due process in consideration of their transfer request and that the failure of the Attorney General to provide them with a hearing prior to denial of this request violated their fifth amendment rights.

The Attorney General argued that 18 U.S.C. § 4102(4) does not impose a mandatory duty to promulgate substantive regulations governing his exercise of discretion in prisoner transfer requests. The Attorney General argued further that the refusal to seek plaintiffs' transfers was reasonable in light of their lengthy criminal records involving violent crimes and their failure to cooperate in ongoing law-enforcement efforts to recover the stolen jewels. Finally, the Attorney General argued that the plaintiffs had no liberty interests in the transfer process entitling them to a hearing prior to denial of their requests for transfer.

The district court held that § 4102(4), viewed in light of its legislative history, does impose a mandatory duty upon the Attorney General to promulgate substantive regulations governing his exercise of discretion in considering prisoner transfer requests. Relying on this initial determination, the district court concluded that mandamus to compel the Attorney General to issue such regulations was appropriate under 28 U.S.C. § 1361. The district court also concluded that the Attorney General's denial of plaintiffs' transfer requests was subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), and that the denial in this case constituted an abuse of discretion. Finally, with regard to plaintiffs' procedural due process claims, the district court stated that a liberty interest arises whenever a statute or regulation places limits on the discretion of administrative officials with regard to transfer decisions. Relying on its earlier conclusion that § 4102(4) of the Act required the Attorney General to issue regulatory standards governing his review in prisoner transfer requests, the trial court held that Scalise and Rachel had a liberty interest in the transfer process which could be denied only through procedures mandated by the due process clause. Concluding that the Attorney General's letter denying plaintiffs' transfer requests was an inadequate basis for review of that decision, the court held that due process required that they be given a more specific explanation of his decision and an opportunity to rebut.

## II. DISCUSSION

In this appeal, the Attorney General contests each of the district court's findings. Most significant, however, is the appeal of the district court's initial determination that § 4102(4) of the Act compels the Attorney General to issue substantive regulations governing the exercise of his discretion in international prisoner transfer decisions. The Attorney General asserts that § 4102(4) does not impose such a mandatory obligation. Based on this position, the Attorney General claims that the district court's exercise of mandamus jurisdiction under 28 U.S.C. § 1361 was not warranted under this court's precedent. The Attorney General further argues that § 701(a)(2) of the APA precludes judicial review of his decision in that his determination is committed to agency discretion by

law.[3] Finally, the Attorney General argues that the district court erred in finding that plaintiffs had a liberty interest entitling them to due process in consideration of their transfer requests.

### Mandatory Duty to Issue Regulations Under § 4102(4)

In determining whether § 4102(4) imposes a mandatory obligation to issue substantive regulations governing the Attorney General's exercise of discretion, our task is one of determining the congressional intent. *United States v. Markgraf,* 736 F.2d 1179 (7th Cir.1984), *cert. dismissed,* 469 U.S. 1199, 105 S.Ct. 1154, 84 L.Ed.2d 308 (1985). In making this determination, we have stated that courts should consider "the language of the statute; the legislative history; and the interpretation given by the administrative agency charged with enforcing the statute." *Id.* at 1182 (citations omitted). Accordingly, we will proceed in that order.

**3.** Although this argument was not raised at the district court level, we conclude that the Attorney General may raise this jurisdictional issue in this appeal. The Attorney General's argument under APA § 701(a)(2) is "jurisdictional" in both its content and its potential impact. As such, our consideration of this argument is in line with the "jurisdictional question" exception to the general rule that an issue not raised in the trial court cannot be raised for the first time on appeal. *See Boyers v. Texaco Refining & Mktg., Inc.,* 848 F.2d 809, 811–12 (7th Cir.1988); *Johnson v. Artim Transp. System, Inc.,* 826 F.2d 538, 548 (7th Cir.1987), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988), *reh'g denied,* —— U.S. ——, 108 S.Ct. 2919, 101 L.Ed.2d 950 (1988); *Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1333 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977); *see also Hormel v. Helvering,* 312 U.S. 552, 556–57, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1940) (There may be exceptional circumstances that will prompt a reviewing or appellate court to consider questions of law which were neither pressed or passed upon by the court below).

**4.** We do not intend to sound pedantic in pointing out this distinction. Congress unquestionably knows how to and is capable of imposing mandatory obligations on Executive branch officials to issue regulations. *See, e.g.,* The Clean Air Amendments of 1970, 42 U.S.C. §§ 7403 *et seq.,* Pub.L. No. 91–604, § 109, 84 Stat. 1676, 1679 (1970):

(a)(1) The Administrator—

Section 4102(4) of the Act, provides that "[t]he Attorney General *is authorized* ... to make regulations for the proper implementation of such treaties in accordance with this chapter and to make regulations to implement this chapter." (emphasis added). We find no merit in the argument that this language by itself imposes a mandatory duty to issue regulations. The language does not provide that the Attorney General "shall" issue regulations, it merely states that he is authorized to do so.[4] Thus, if a mandatory duty is to be found in this section, it must arise from the legislative history.[5]

 The district court's determination that the Attorney General is mandated to issue regulations was based primarily on the language of the Committee Report of the House Judiciary Committee, H.Rep. No. 95–720, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. and Admin. News 3146, 3155.[6] This Committee Report

(A) within 30 days after the date of enactment of the Clean Air Amendments of 1970, *shall publish* proposed regulations...." (emphasis added).

**5.** Under Seventh Circuit precedent, it is proper for a court to look beyond the express language of a statute in order to give force to congressional intent only in those situations where the statutory language is ambiguous, or where a literal interpretation of the statutory language would thwart the overall purpose of the statutory scheme. *United States v. Stewart,* 865 F.2d 115, 116 (7th Cir.1988) (quoting *United States v. Tex–Tow, Inc.,* 589 F.2d 1310, 1313 (7th Cir. 1978)). Just as we conclude that this statutory language does not impose a mandatory obligation to issue regulations, we also believe that the context in which this language is stated does not clearly imply that it is permissive. Thus, the "ambiguous" nature of the statutory language permits us to examine the legislative history to determine congressional intent.

**6.** This Report provides in part:
Under existing treaties and this legislation, the Attorney General must agree to the receipt or transfer of an offender. The committee was concerned that the Attorney General exercise his discretion on this consent with care. In most cases, and possibly almost all cases, he should agree to any receipt or transfer, if the offender requests or voluntarily consents to such transfer. However, they [sic] may be an unusual situation, involving possibly a dangerous offender, where the Attorney General

expresses an "expectation" that the Attorney General will issue substantive regulations. An expression of an "expectation" by one committee of the House, however, does not establish congressional intent. As the Supreme Court stated in *Pierce v. Underwood*, 487 U.S. 552, ——, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490 (1988), "it is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means." *See also International Brotherhood of Electrical Workers Local Union No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987) (quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1054 n. 11 (D.C. Cir.1986), *aff'd* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).[7] While we recognize that statements made in committee reports are generally regarded as indicia of legislative purpose, *see, e.g., Mills v. United States*, 713 F.2d 1249 (7th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984); *Miller v. Federal Mine Safety and Health Review Comm'n*, 687 F.2d 194 (7th Cir.1982), the unique nature of international prisoner transfer decisions and the absence of any indication of an obligation in both the Senate Report and the statutorily enacted language leads us to reject this "expectation" as expressed in the House Committee Report as dispositive.

The Act simply authorizes the Attorney General to issue regulations; it does not,

however, provide substantive guidelines by which the Attorney General should exercise his discretion. Nor does the Act provide guidance in the issuance of such regulations should the Attorney General choose to issue regulations.[8] This fact is important in our survey of congressional intent in that this discretion which Congress has bestowed upon the Attorney General in carrying out his duties under the Act is reasonable in light of the unique nature of prisoner transfer decisions. This court has recognized in *Shango v. Jurich*, 681 F.2d 1091 (7th Cir.1982), that prisoner transfer decisions are unique in that they turn on an assessment of a variety of considerations. As we stated, "interprison transfers obviously are not 'mindless events;' rather '[t]ransfers between institutions ... are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate.'" *Id.* at 1102 (quoting *Meachum v. Fano*, 427 U.S. 215, 226, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976)). Although our decision in *Shango* revolved around intrastate transfer decisions made by state prison officials, we believe that in interprison transfer decisions, whether they be international or intrastate, the decisionmaking authority necessarily considers many of the same penological considerations. In this regard, we are not unmindful of the fact

---

should not agree to the return of the offender, and his immediate eligibility for parole, to the United States. Similarly, there may be an unusual situation, involving an individual in American persons [sic], who for matters of future law enforcement, continuing investigation, or other national interests, should not be sent to his home country. The committee therefore expects the Attorney General to promptly establish regulations and to provide standards and guidelines which will govern the exercise of his discretion as to his consent to receive or transfer offenders.

**7.** Our reluctance to adopt as dispositive this language from the House Committee Report is premised not only on the lack of support which this "expectation" receives in either the Senate Report, *see* S.Rep. No. 95–435, 95th Cong., 1st Sess., 1977 U.S.Code Cong. & Admin.News, p. 3146, or the statutory language as it was finally enacted, but also from the contradictory nature of the legislative history itself. The uncertain

nature of the legislative history is evidenced by the statements of Rep. Eilberg, the sponsor of the bill, during floor debates on the date of passage in the House. Responding to concerns expressed by Rep. Kazen, Rep. Eilberg emphasized the discretion to be accorded the Attorney General under the provisions of this Act:

[A prisoner] is not automatically entitled to be exchanged to the United States after conviction and sentence. It would require the discretionary consent of [the foreign government] and the discretionary consent of our our [sic] Government, as exercised here by the Attorney General.... *The Attorney General would exercise his discretion as he deems reasonable.* (emphasis added).

**8.** The Attorney General has published regulations governing the procedural mechanics of prisoner transfers in accordance with the discretion granted to him in § 4102(4) of the Act. *See* 28 C.F.R. §§ 527.40 *et seq.*, 28 C.F.R. § 0.64–2 plus Appendix, and 28 C.F.R. § 0.96b.

that a salutary purpose of the Convention is to further the social rehabilitation of international prisoners by providing for their transfer to their home countries. Contrary to plaintiffs' arguments in this appeal, however, we do not believe that our construction of § 4102(4) necessarily frustrates this purpose. Moreover, we are reluctant to put the cart before the horse in ruling that the achievement of this purpose should override the assessment of the necessary penal considerations which entered into the Attorney General's decision in this case.

The record indicates that such a discretionary assessment of various considerations was undertaken by the Attorney General in denying plaintiffs' requests. In a letter to Plaintiff's counsel, the Department of Justice, acting on behalf of the Attorney General, recited the principal factors it took into consideration in deciding not to request Mr. Scalise's transfer. The Attorney General highlighted the relative seriousness of his offense; his extensive criminal record; the manner of his return to the United Kingdom; his "A" security classification in the United Kingdom, the highest security category; and, the likelihood that a transfer would not further his rehabilitation. (Appellant's Separate App. p. 41). While these considerations may not appease those most intimately concerned, it is not our job to second guess the Attorney General's weighing of these considerations in his decision-making process. As we recognized in *Shango*, "[s]uch discretionary decisions are the business of penologists and 'are not the business of federal judges.'" *Id.* at 1102 (quoting *Meachum*, 427 U.S. at 229, 96 S.Ct. at 2540).

In reaching our conclusion, we note that our construction of § 4102(4) is consistent with constructions given to other similar statutes by both this court and the United States Supreme Court. In *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Court was asked to review a decision on the part of the Food and Drug Administration ("FDA") not to take enforcement actions to prevent alleged violations of the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040, as amended, 21 U.S.C. §§ 301 *et seq.* ("FDCA"). Section 372 of the FDCA, the specific enforcement provision in question, provided that "the Secretary *is authorized* to conduct examinations and investigations for the purposes of this Act...." (emphasis added). Although the specific issue presented to the Court was the reviewability of the FDA's decision under § 701(a)(2), it is noteworthy that the Court's ultimate conclusion that the FDA decision was not reviewable was premised on the underlying determination that the language of § 372 was permissive and not mandatory in nature.

Likewise, in *Arnow v. United States Nuclear Regulatory Comm'n*, 868 F.2d 223 (7th Cir.), *cert. denied sub nom., Citizens of Illinois v. United States Nuclear Regulatory Comm'n*, — U.S. —, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989), this court interpreted language similar to that contained in § 4102(4) of the Act as permissive and not mandatory. The dispute in *Arnow* arose under the Nuclear Regulatory Commission's interpretation of their obligation to issue orders under the Atomic Energy Act, 42 U.S.C. §§ 2011 *et seq.* ("AEA"). Section 2201(c), the specific provision of the AEA in question, "authorizes" the NRC to "make such studies and investigations ... as the Commission may deem necessary or proper to assist it in [the] ... enforcement of this chapter." Again, while the specific issue presented to this court dealt with the reviewability of the Commission's final decision denying petitioner's request for an issuance of an order, it is instructive that the language of § 2201(c) was construed as bestowing discretion upon the NRC in its enforcement of the AEA's provisions.[9]

Finally, in *Markgraf,* this court was asked to rule on the nature of the Secre-

---

**9.** In dicta, this court further implied that the language in 42 U.S.C. § 2201(p) which provides that the NRC is "authorized ... to make, promulgate, issue, rescind, and amend such rules and regulations as may be necessary to carry out the purposes of this Chapter" was permissive in nature.

tary of Agriculture's duties under the Agricultural Act of 1961, 7 U.S.C. § 1981a (1982). This section provides that, "the Secretary may permit ... the deferral of principal and interest on any outstanding loan ... and may forego foreclosure of any such loan...." Plaintiffs sought to compel the Secretary of Agriculture to implement § 1981a. Plaintiffs also sought to compel the Secretary to promulgate regulations providing procedural and substantive guidelines governing the Secretary's decisions whether or not to grant relief in individual cases. This court held that the Secretary does have a mandatory duty to "implement" this Act. This conclusion, we held, was supported both by inferences drawn from the statutory language and the legislative history underlying the Act's passage. Of greater importance for the present circumstances, however, was our conclusion that the Secretary was not under any obligation to promulgate substantive regulations governing his exercise of discretion under § 1981a. This latter determination was premised in part on the fact that, although the House version of § 1981a expressly provided for "regulations prescribed by the Secretary", the final version of the bill as enacted by Congress did not make reference to such "regulations". We stated that "[t]his deletion of the express requirement of regulations, although not conclusive, indicates that Congress did not intend to mandate that the Secretary act through regulations." *Markgraf*, 736 F.2d at 1185. Applying this same reasoning to the issue presented to the court today, we conclude that Congress did not intend § 4102(4) to impose a mandatory obligation on the Attorney General to issue substantive regulations in the exercise of his discretion in prisoner transfer decisions.

As pointed out earlier, a final factor to be considered in determining congressional intent is the interpretation given to the statute by the agency charged with enforcing the statutory provision. As we stated in *Markgraf*, "[i]t is a well-established maxim that courts will give substantial deference to an agency's interpretation of a statute that it is charged with enforcing." *Id.* at 1183. There can be no question as to

how this consideration cuts under the present circumstances. The Attorney General's fundamental premise underlying all issues in this appeal is that § 4102(4) does not impose a mandatory obligation to issue substantive regulations governing his exercise of discretion in prisoner transfer decisions.

In sum, based on the statutory language, the lack of any dispositive evidence in the legislative history, the unique nature of prisoner transfer decisions, and the deference owed to the Attorney General's interpretation of this statutory provision, we conclude that § 4102(4) does not impose a mandatory obligation on the Attorney General to issue substantive regulations. Having so determined, we proceed to review the propriety of the district court's issuance of the writ of mandamus, the district court's review of the Attorney General's denial of plaintiffs' transfer requests, and the conclusion that § 4102(4) creates a liberty interest that was violated by the Attorney General under these facts.

### Writ of Mandamus

■ Relying on the authority apparently granted by 28 U.S.C. § 1361, the district court below issued a writ of mandamus ordering the Attorney General to promulgate regulations to govern requests from American citizens incarcerated abroad for transfer to American prisons. The Attorney General argues that this action on the part of the district court was without foundation under the terms of 18 U.S.C. § 4102(4). By virtue of our conclusion that § 4102(4) does not impose a mandatory obligation on the Attorney General, we agree with the Attorney General and hold that the issuance of a writ of mandamus under this section was not warranted.

Under 28 U.S.C. § 1361, the "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." This grant of jurisdiction, however, has been substantially limited in scope under the decisions of this court. Specifically, this circuit has rec-

ognized that mandamus is an "extraordinary remedy" and, as such, may be invoked only when there is:

(1) a clear right in the plaintiff to the relief sought;

(2) a plainly defined and peremptory duty on the part of the defendant to do the act in question;

(3) no other adequate remedy available.

*Burnett v. Bowen,* 830 F.2d 731, 739 (7th Cir.1987) (quoting *Homewood Professional Healthcare Center, Ltd. v. Heckler,* 764 F.2d 1242, 1251 (7th Cir.1985)); *see also Save the Dunes Council v. Alexander,* 584 F.2d 158, 162 (7th Cir.1978) (It is manifest that the judiciary cannot compel through a writ of mandamus a federal official to perform any function unless the official is clearly directed by law to perform such a duty). The statutory provision at issue in this appeal, 18 U.S.C. § 4102(4), does not satisfy these jurisdictional prerequisites.

Under this section, the Attorney General does not have a "plainly defined and peremptory duty" to issue substantive regulations governing his exercise of discretion. As we concluded above, § 4102(4) does not impose such an obligation, but rather leaves this to the discretion of the Attorney General. In the absence of such an obligation under § 4102(4), the district court's exercise of mandamus jurisdiction under § 1361 was not warranted under this court's precedent and the writ should be vacated.

### Review of Attorney General's Discretion Under § 701(a)(2)

■ The Administrative Procedure Act provides generally for judicial review of final agency action when a person has suffered legal wrong as a result of an agency action. 5 U.S.C. § 702. Under § 701(a)(2), however, judicial review is not to be had if the "agency action is committed to agency discretion by law." The Attorney General's claim that the district court was without jurisdiction to review his denial of plaintiffs' transfer requests is based on this statutory exception and the interpretation given to § 701(a)(2) by both this court and the United States Supreme Court.

In *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), the Court stated, with regard to § 701(a)(2), that "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 600, 108 S.Ct. at 2052 (quoting *Heckler,* 470 U.S. at 830, 105 S.Ct. at 1655). This interpretation of the language of § 701(a)(2) was expressly relied upon by this court in *Arnow,* wherein we held that we did not have jurisdiction to review a decision of the Nuclear Regulatory Commission denying a request from Illinois citizens for the issuance of an order. 868 F.2d at 234; *see also Singh v. Moyer,* 867 F.2d 1035, 1037–38 (7th Cir.1989) (In determining whether there is a meaningful standard for purposes of review under § 701(a)(2), this court looks to: the statutory language, the statutory structure, the legislative history, and the nature of the agency action). The same principle that governed our determination in those cases governs our decision here.

In all of these cases, judicial review of the agency decision was precluded by virtue of the fact that the reviewing court would have no law to apply under the statute in question by which to review the action undertaken by the agency. The language of § 4102(4) is substantially similar to those discussed in *Webster, Heckler* and *Arnow.* Section 4102(4) provides that "[t]he Attorney General is authorized ... to make regulations for the proper implementation of such treaties...." This language, by itself, certainly does not provide the reviewing courts with any guidance. Furthermore, no other provisions of the Act provide for any standards by which the Attorney General could measure his conduct in exercising his authority under § 4102(4). In the absence of any standards upon which this court could review the Attorney General's discretionary authority, and in light of our earlier determination that § 4102(4) does not impose a mandatory obligation to issue such substantive regulations, we conclude that Congress has provided no "meaningful standard" for review-

ing the Attorney General's conduct and, as such, has committed these determinations to the Attorney General's discretion. Accordingly, we hold that the district court did not have jurisdiction under § 701(a)(2) to review the Attorney General's denial of plaintiffs' requests.

### Liberty Interest

■ The district court's determination that the provisions of the Act create a liberty interest under the due process clause of the fifth amendment in favor of those prisoners seeking an international transfer was premised, in large part, on the Supreme Court's reasoning in *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). In *Olim*, an interstate prisoner transfer case, the Court stated that a liberty interest would be implicated in prisoner transfer decisions where the statute or administrative regulation places substantive limitations on the discretion of the administrative officials. *Id.* at 249, 103 S.Ct. at 1747; *see also Meachum*, 427 U.S. at 228, 96 S.Ct. at 2540; *Montanye v. Haymes*, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976).[10] Applying this rationale to its earlier conclusion that § 4102(4) does impose a mandatory obligation on the Attorney General to issue substantive regulations governing his exercise of discretion, the district court concluded that plaintiffs' due process rights were implicated and that the Attorney General's actions in this case did not protect the due process rights to which the plaintiffs were allegedly entitled.

As the Court stated in *Olim*, however, before a protected liberty interest can be said to have been created, "an inmate must show 'that particularized standards or criteria guide the State's decisionmakers.'" 461 U.S. at 249, 103 S.Ct. at 1747 (quoting *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 467, 101 S.Ct. 2460,

2465, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring); *see also Campbell v. Miller*, 787 F.2d 217, 223 (7th Cir.), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1988). This standard has most recently been reiterated by the Court in *Kentucky Dep't of Corrections v. Thompson*, —— U.S. ——, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). In *Thompson*, the Court held that prisoners could not establish a liberty interest in receiving certain visitors without first showing that the regulations in question contained "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow...." *Id.* at ——, 109 S.Ct. at 1910. We have already concluded that the Attorney General is not obligated under § 4102(4) of the Act to issue substantive regulations governing his exercise of discretion. Further, under the standard set forth in *Thompson*, plaintiffs cannot point to any language in the Act that would support an assertion that their transfer was required upon the satisfaction of certain "substantive predicates." As such, plaintiffs have failed to show the "particularized standards or criteria" necessary to establish the existence of a liberty interest in this context. Accordingly, we reverse the district court's determination that § 4102(4) raises a liberty interest in prisoners seeking international prison transfers.[11]

For the foregoing reasons, the decision of the district court granting plaintiffs' motion for summary judgment is reversed and remanded for proceedings consistent with this opinion.

---

**10.** Like the district court below, we have found no authority on the liberty interests, if any, of American citizens imprisoned in foreign countries who seek international prison transfers. We believe, however, that there is no reason to treat these prisoners seeking international prison transfers differently from American prisoners who claim a due process right to be, or not

to be, transferred interstate from prison to prison.

**11.** We need not address the propriety of the Attorney General's actions under a due process analysis since we find that § 4102(4) does not raise a due process right.