Cheong Wai WONG, Petitioner,

v.

WARDEN, FCI RAYBROOK,
Respondent.

No. 96–CV–537.

United States District Court,
N.D. New York.

April 9, 1998.

---

Cheryl J. Sturm, Westtown, PA, for Petitioner.

Thomas J. Maroney, United States Attorney for the Northern District of New York, Albany, NY (Barbara D. Cottrell, Assistant U.S. Attorney, of counsel), United States Department of Justice, Criminal Division, Washington, DC (Robin Kofsky Gold, of counsel), for Respondent.

## MEMORANDUM–DECISION and ORDER

HURD, United States Magistrate Judge.

Cheong Wai Wong ("Wong" or "petitioner") filed the instant petition for a writ of habeas corpus on April 2, 1996, pursuant to 28 U.S.C. § 2241. Wong alleges that he was denied a transfer to Canada on the basis of his race and national origin, in retaliation for exercise of constitutional rights, and that the denial was arbitrary, capricious and whimsical, in violation of the Fifth Amendment to the United States Constitution. Respondent denies that the decision regarding Wong's transfer was based upon his race and national origin, or that it was retaliatory. Respondent further argues that review is precluded by the Administrative Procedure Act and that Wong has no protected liberty interest in a discretionary transfer.

### I. BACKGROUND

On June 6, 1991, Wong was sentenced to 19 years and 6 months (235 months) incarceration after being found guilty of conspiracy to distribute heroin, in violation of 21 U.S.C. § 846. Wong's base offense level of 36 was increased by two for obstruction of justice. His offense involved approximately 85 pounds of heroin. Wong is currently serving his sentence in the Federal Correctional Institution at Ray Brook, New York ("Ray Brook").

Wong, who ancestry is Chinese, is a citizen of both Hong Kong and Canada. On September 18, 1992, Wong submitted an Application for Transfer to Canada. See Convention on the Transfer of Sentenced Persons, Mar. 21, 1983, T.I.A.S. No. 10824, 22 I.L.M. 530 (entered into force July 1, 1985) (hereinafter "Convention on Transfer"). The Solicitor General of Canada approved Wong's application on November 4, 1994, and formally requested his transfer. On March 22, 1995, the United States Department of Justice denied the transfer request.

Thereafter, Wong filed the instant petition alleging unconstitutional denial of his transfer based upon his Chinese ancestry. By Traverse filed on July 25, 1996, Wong set forth information regarding twelve persons

transferred to Canada through Ray Brook in 1994, 1995, and 1996. These persons had offense levels of 36 or 38, had served 15 to 30% of their sentences at the time of transfer, and had been convicted of offenses involving large quantities of controlled substances. Petitioner alleged that none of the persons transferred were of Chinese ancestry. Petitioner thus showed a colorable claim of discrimination entitling him to discovery, which respondent provided, as ordered, on December 30, 1997.[1] *See* Rules Governing § 2254 Cases R.6; L.R. 72.4(a).

## II. *DISCUSSION*

### A. Convention on Transfer

The Convention on Transfer provides for transfer of sentenced persons to the countries of their citizenship in order to "further the ends of justice and the social rehabilitation of sentenced persons." Both the transferor state and the transferee state must approve the transfer. *See* Convention on Transfer Art. 3. Congress has authorized the Attorney General to transfer sentenced persons to the foreign country of which they are citizens or nationals. 18 U.S.C. § 4102(3). The Attorney General may delegate this authority to the Department of Justice, § 4102(11), and has done so, 28 C.F.R. §§ 0.64–2, 0.96b. Regulations governing international transfers prohibit transfer in certain specified circumstances, inapplicable here, but otherwise direct review and determination of the appropriateness of transfer without providing guidelines for such determination. *See* 28 C.F.R. §§ 0.64.2, 527.40–.44; *Bagguley v. Bush,* 953 F.2d 660, 662 (D.C.Cir.1991) (transfer decision under treaty discretionary), *cert. denied,* 503 U.S. 995, 112 S.Ct. 1698, 118 L.Ed.2d 408 (1992); *Scalise v. Thornburgh,* 891 F.2d 640, 649 (7th Cir.1989) (same), *cert. denied,* 494 U.S. 1083, 110 S.Ct. 1815, 108 L.Ed.2d 945 (1990).

### B. Propriety of Review—Administrative Procedure Act

■ Respondent argues that the appropriate section of the Administrative Procedure

Act, 5 U.S.C. § 701(a)(2), precludes judicial review of a discretionary agency final decision, such as denial of a transfer request. While § 701(a)(2) does preclude judicial review of discretionary agency decisions, respondent's argument must fail because petitioner's claim is grounded in the constitution. When the allegation is of a constitutional violation, judicial review is available despite the general preclusion from review of discretionary decisions. *Webster v. Doe,* 486 U.S. 592, 603–05, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (colorable claim that discretionary agency decision violated the Constitution is reviewable by district court despite § 701 of the Administrative Procedure Act); *Argabright v. United States,* 35 F.3d 472, 476 (9th Cir.1994) (citing *Horton Homes, Inc. v. United States,* 936 F.2d 548, 554 (11th Cir.1991)); *see also Buckeye Cablevision, Inc. v. United States,* 438 F.2d 948, 951–52 (6th Cir.1971) (court reviews constitutional challenge to final, nonreviewable agency decision); *cf. Brawer v. Levi,* 435 F.Supp. 534, 537–38 (S.D.N.Y.1977) (if pro se complaint, styled as an action for review of agency decision under the Administrative Procedure Act, were read liberally to be an action under 28 U.S.C. § 2255, court could reach constitutional question; however, as a *Bivens* suit for constitutional deprivation it must be dismissed based upon prosecutorial immunity). Accordingly, the decision denying Wong's transfer request is reviewable to determine if the decision was based upon *unconstitutional grounds.*

### C. Liberty Interest Protected by Due Process

■ Respondent argues that there could be no due process violation because petitioner has no liberty interest in transfer pursuant to the Convention on Transfer due to the discretionary nature of the transfer decision. Ordinarily where a decision is discretionary, it is held that no protected liberty interest exists. *See Bagguley,* 953 F.2d at 662; *Scalise,* 891 F.2d at 649. That is so because the liberty interest at stake is not grounded in the Constitution, but rather would have been

---

1. Multifarious motions, responses, and other procedural snafus by the respondent impeded progress toward the provision of complete discovery.

However, these proceedings are irrelevant to the current issue of the legitimacy of petitioner's allegations and therefore are not recounted.

created by the delimiting nature of statutes or regulations, *see, e.g., Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 462, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Bagguley,* 953 F.2d at 662; *Scalise,* 891 F.2d at 649.

Liberty, as protected by the due process clause of the Fifth Amendment, is "not confined to mere freedom from bodily restraint," but "extends to the full range of conduct which the individual is free to pursue." *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Discrimination based upon race is so unjustifiable that it violates the broad liberty interest protected by the due process clause of the Fifth Amendment, similar to the manner in which such discrimination violates the equal protection clause of the Fourteenth Amendment. *See Id.* at 499–500.

■ Accordingly, Wong is protected, by the due process clause of the Fifth Amendment, from a discriminatory denial of transfer based upon race or national origin. *See id.; cf. Wade v. United States,* 504 U.S. 181, 185–86, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992) (discretionary decision to depart from sentencing guidelines may not be based upon unconstitutional motives such as race or religion); *Batson v. Kentucky,* 476 U.S. 79, 91, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (peremptory challenge, historically free from judicial review, is unconstitutional when based upon race); *United States v. Leung,* 40 F.3d 577, 587–87 (2d Cir.1994) (sentencing unconstitutional when alien status and ethnicity appeared to influence the sentence given); *United States v. Edwardo–Franco,* 885 F.2d 1002, 1005 (2d Cir.1989) (conviction reversed where appearance of judicial bias based upon race and nationality). Similarly, he is protected from retaliation for the exercise of his constitutional rights. *Prows v. Federal Bureau of Prisons,* 981 F.2d 466, 468–69 n. 3 (10th Cir.1992), *cert. denied,* 510 U.S. 830, 114 S.Ct. 98, 126 L.Ed.2d 65 (1993); *see also Perry v. Sindermann,* 408 U.S. 593, 595, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (retaliation for exercise of free speech); *Smith v. Maschner,* 899 F.2d 940, 948–49 (10th Cir.1990) (retaliation for exercise of right to access the courts); *cf. United States v. Stratton,* 820 F.2d 562, 564 (2d Cir.1987) (impermissible to enhance sentence for failure to cooperate, regardless of whether failure was due to exercise of right against self-incrimination).

## D. Merits of Petitioner's Claim

### 1. Analytical Framework

Analysis of a purposeful discrimination claim follows the burden shifting rules used under Title VII of the Civil Rights Act of 1964. *Batson,* 476 U.S. at 94 n. 18 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). First, the alleged victim of discrimination must make out a prima facie case of discrimination. *Id.* 476 U.S. at 93–94. Direct and circumstantial evidence may be used to support an inference of discriminatory purpose to meet the required prima facie showing. *Id.* Next, the burden shifts to the government to show a nondiscriminatory reason for the action. *Id.* The ultimate burden of proving purposeful discrimination rests with the alleged victim. *Id.* at 94 n. 18.

■ Historical statistical data may give rise to an inference of discrimination sufficient to make out a prima facie case where, for example, "'a clear pattern, unexplainable on grounds other than race, emerges.'" *Castaneda v. Partida,* 430 U.S. 482, 493, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); *Hill v. Texas,* 316 U.S. 400, 404, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942) ("chance or accident could hardly have accounted for the continuous omission [of African-Americans being called to grand jury service] ... for so long a period as sixteen years or more"); *United States v. Alvarado,* 923 F.2d 253, 255–56 (2d Cir.1991); *see also McCleskey v. Kemp,* 481 U.S. 279, 291, 293–94, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (rejecting proffer of statistical study; distinguishing the limited contexts in which statis-

tics demonstrate a "stark pattern" sufficient to raise inference of discrimination).

## 2. Race/National Origin Discrimination

Petitioner suggests that an inference of purposeful discrimination arises from the fact that no Orientals have been approved for transfer, as shown by the discovery provided by respondent.[2] Petitioner asserts that the listing of individuals shows that no Orientals have been approved for transfer, and that an inference of discrimination based upon Oriental race and/or national origin arises. It is clear, however, that no inference of discrimination can be drawn from the transfer approval and denial records.

Respondent provided information pertaining to individuals for whom a request for repatriation was pending or ruled upon while such individual was incarcerated at Ray Brook in 1994, 1995, and 1996, whose Base Offense Level or Total Offense Level is 34 or higher, as follows:

1. the country to which each individual requested repatriation;

2. the race of each individual;

3. the national origin of each individual;

4. the status of each repatriation request, and the date of repatriation of each individual whose repatriation request was granted;

5. the sentence, in months, of each individual; and the amount of time served by each individual, in months and as a percentage of the total sentence;

6. the Base Offense Level and Total Offense Level of each individual; and the factors for which the Base Offense Levels were increased or decreased for each individual; and

7. the crimes for which each individual is incarcerated, including the drug involved, if any, and the amount of such drug.

The list provided included seventy-nine (79) individuals. (*See* App. filed 12–30–97.) Sev-

en individuals were either ineligible for transfer or withdrew their transfer request. The requests of two individuals are pending. Seventy (70) requests were ruled upon. Of the seventy, 56 were approved for transfer (80%), and 14 were denied (20%).

The base offense levels of the seventy individuals ranged from 32 to 40, and the total offense levels ranged from 27 to 42. Base offense levels were increased or decreased due to the role in the crime, acceptance of responsibility, cooperation with the authorities, obstruction of justice, and use of a firearm, among others. Base offense levels for individuals whose transfer was approved were as low as 32 and as high as 40. Base offense levels for individuals whose transfer was denied were as low as 34 and as high as 40. Total offense levels for individuals whose transfer was approved were as low as 27 and as high as 42. Total offense levels for individuals whose transfer was denied were as low as 32 and as high as 38.

Sentences ranged from 18 months to 360 months. Of those approved for transfer, sentences ranged from 42 months to 360 months. Of those denied transfer, sentences ranged from 18 months to 293 months.

Crimes involved included, among others, possession with intent to distribute controlled substances, conspiracy to possess with intent to distribute controlled substances, conspiracy to import controlled substances, and importation of controlled substances. The controlled substances associated with the offenses included cocaine, heroin, marijuana, hashish, amphetamines, and opium. The approximate amounts of controlled substances ranged as follows: cocaine (1 kg to 1500 kg), hashish (518 kg to 2,906 kg), heroin (500 g to 100 kg), marijuana (67 kg to 9,979 kg), amphetamines (20 kg yield), opium (2.2 kg). Some of the of-

**2.** Petitioner then attempts to "rebut" the legitimate reasons for the denial which respondent proffered. Articulation of non-discriminatory reasons for the transfer by respondent is necessary only when petitioner has made out a prima facie case. *See Batson,* 476 U.S. at 94. Accordingly, respondent's non-discriminatory reasoning, and petitioner's criticism of it, will be considered only if petitioner establishes a prima facie case.

fenses involved multiple controlled substances. Individuals approved for transfer had involvement with controlled substances in the following ranges: cocaine (1 kg to 1500 kg), hashish (518 kg to 2,906 kg), heroin (500 g to 100 kg), marijuana (450 kg to 4,989 kg), amphetamines (20 kg yield) (one individual), opium (2.2 kg) (one individual). Individuals whose transfer requests were denied had offenses involving the following ranges of controlled substances: cocaine (3 kg to 1300 kg), hashish (2,160 kg) (one individual), heroin (3 kg to 38 kg), marijuana (67 kg to 9,979 kg). Percentage of transfer applications denied, by controlled substance involved in the offense follows:

| | |
|---|---|
| heroin | 27% |
| cocaine | 12% |
| marijuana | 67% |
| hashish | 17% |
| multiple substances | 20%. |

Additionally, twenty-five percent (25%) of the individuals whose offenses involved firearms were denied transfer.

Of individuals who applied for transfer to the country of their national origin,[3] twenty percent (20%) were denied. Twenty percent (20%) of individuals who applied for transfer to a country different than that of their national origin were denied transfer. Eighteen percent (18%) of the individuals born in Canada were denied repatriation to Canada. Twenty-one percent (21%) of the individuals not born in Canada but who were Canadian citizens were denied transfer to Canada.

Approximately seventeen percent (17%) of the eligible applicants for transfer were non-white.[4] Of the ten non-white transfer applicants, only three (30%) were denied transfer. Eighteen percent (18%), or eleven out of sixty, of the white transfer applicants were denied transfer. Of the three Oriental–Asian applicants, two were approved and one was denied, a denial rate of 33 1/3%. Reference is made to Appendix I, which summarizes these transfer request statistics based upon the information provided by respondent in discovery.

■ Petitioner's assertion that no Orientals were approved for transfer is not borne out by the evidence of transfer applicants. See supra note 4. The only way that the list can be viewed as containing no Orientals transferred, is to view the list as containing no Oriental applicants. See supra note 4. Petitioner's assertion, therefore, is fallacious in that its conclusion is based upon the premise that petitioner himself is not Oriental, when the petitioner's claim is that he was discriminated against because he is Oriental. See supra note 4.

The documentation provided by respondent reveals no significant difference in the overall denial rate as compared with the denial rate for non-white individuals, or individuals of non–Canadian national origin. Additionally, there is no significant difference in the overall denial rate of 20%, the denial rate for whites of 18%, and the denial rate for Orientals of 33 1/3%. In fact, denial rates for any categorization criteria vary insignificantly.[5] No inference can be drawn that race

3. Where an individual's place of birth and country of citizenship differ, national origin refers to place of birth. (See Resp't Resp. to Ct. Order Ex. 1 ¶ 14.)

4. Non-white includes individuals whose race was identified as white/Hispanic, Asian/black, Asian/white, Oriental/white, Hispanic/black, black, and black/white, for the purposes of this decision. The race of the individuals was determined from Bureau of Prisons records ("BOP") and Presentence Investigation reports ("PSI"). See id. ¶ 13. Where the BOP and PSI were inconsistent, both were included, resulting in the dual race identifiers such as "white/Hispanic." Ordinarily one would suppose that the PSI, on which race is self-reported, would be the more accurate source. However, here petitioner self-reported on the PSI that his race was "white," while the BOP identified him as Asian. Thus, if only the PSI were used as a source, then petitioner would not be considered a member of the race of which he alleges discrimination against him was based. For this reason, if either the BOP or PSI included a non-white designation, then that individual is considered non-white here. Moreover, if the individuals designated as Asian/white, Oriental/white, and Asian/black were considered white or black, rather than Oriental–Asian, because of the inconsistent dual designation, then there would be no Oriental–Asian transfer applicants listed.

5. Criteria by which transfer denials were analyzed include the type of controlled substance

and national origin play any part in approving or denying applications for transfer. *See, e.g., McCleskey,* 481 U.S. at 291–94 (distinguishing cases in which "stark pattern" gave rise to inference of discrimination); *Rose v. Mitchell,* 443 U.S. 545, 574, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). Accordingly, petitioner has failed to meet his burden of establishing a prima facie case. It is unnecessary, therefore, for respondent to set forth non-discriminatory reasons in rebuttal. *See Batson,* 476 U.S. at 97.

### 3. Retaliation

■ Petitioner argues that respondent denied his transfer in retaliation because he refused to cooperate or assist law enforcement, in exercise of his constitutional rights. Petitioner points to the transfer status of individuals who provided substantial assistance to the government, and asserts that transfer is favored for those who assisted the government. However, the documentation provided by respondent shows that transfers were denied for thirty-two percent (32%) of the individuals who received a decrease in offense level or a downward departure from the sentencing guidelines due to substantial assistance to the government. This percentage is not significantly different from the overall denial rate of twenty percent (20%). Moreover, even if petitioner established that substantial assistance was favored, that does not establish that petitioner himself was reta-liated against because he did not provide assistance. Assuming arguendo that retaliation for failure to cooperate presents a valid constitutional claim, no inference of retaliation can be drawn from the information presented.

### 4. Arbitrary, Capricious, Whimsical

Petitioner makes no cogent argument about how the denial of his transfer request was arbitrary, capricious, or whimsical. This basis for relief, therefore, is not considered.

## III. *CONCLUSION*

No inference of discrimination based upon race or national origin arises from the evidence of transfer applicants. Similarly, no inference of retaliation arises from this evidence. Nor is there any evidence that the decision to transfer petitioner was arbitrary, capricious, or whimsical. Petitioner has failed to establish a prima facie case of discrimination based upon unconstitutional grounds. No issue of fact is involved, and as a matter of law no cause exists for granting the writ. *See Walker v. Johnston,* 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830 (1941).

Accordingly, it is hereby

ORDERED that Wong's petition for a writ of habeas corpus is DENIED.

IT IS SO ORDERED.

---

involved, same or different national origin and country to which repatriation was requested, offense level ranges, sentence ranges, and amounts of controlled substance involved. The denial rates for each category were approximately the same, ranging generally from 12–27%. The only exceptions, that is categories with denial rates outside that range, were with crimes involving marijuana (67% denial rate), opium (zero denied), and amphetamines (zero denied). These rates may be explained by the small number of individuals whose crimes involved these substances, as follows: marijuana (six), opium (one) and amphetamines (one). See Appendix I for a chart of these statistics.

Similarly, the offense level ranges, sentence ranges, and range in amounts of substance involved in the offense did not vary significantly between those approved for transfer and those denied transfer. *See* Appendix I.

## APPENDIX I

1994–1996 Transfer Request Statistics
Federal Correctional institute at Ray Brook, New York

|  | Number Eligible | Number Approved | Number Denied | Percent Denied |
|---|---|---|---|---|
| Overall | 70 | 56 | 14 | 20% |
| White | 60 | 49 | 11 | 18% |
| Non-white * | 10 | 7 | 3 | 30% |
| (Oriental ** | 3 | 2 | 1 | 33⅓%) |
| Controlled Substance Involved: |  |  |  |  |
| Cocaine | 50 | 44 | 6 | 12% |
| Hashish | 6 | 5 | 1 | 17% |
| Heroin* | 15 | 11 | 4 | 27% |
| Marijuana | 6 | 2 | 4 | 67% |
| Amphetamines | 1 | 1 | 0 | 0% |
| Opium | 1 | 1 | 0 | 0% |
| Multiple Substances Involved | 10 | 8 | 2 | 20% |
| Firearm Involved | 4 | 3 | 1 | 25% |
| Same national origin and country to which repatriation requested | 40 | 32 | 8 | 20% |
| Different national origin and country to which repatriation requested | 30 | 24 | 6 | 20% |
| Canadian birth—transfer to Canada | 38 | 31 | 7 | 18% |
| Non–Canadian birth—transfer to Canada * | 28 | 22 | 6 | 21% |

|  | Overall | Approved | Denied |
|---|---|---|---|
| Base Offense Level (Range) | 32–40 | 32–40 | 34–40 |
| Total Offense Level (Range) | 27–42 | 27–42 | 32–38 |
| Sentence (Range in months) | 18–360 | 42–360 | 18–293 |
| Controlled Substance Involved (Range of Amount): |  |  |  |
| Cocaine | 1–1500 kg | 1–1500 kg | 3–1300 kg |
| Hashish | 518–2906 kg | 518–2906 kg | 2160 kg |
| Heroin | 0.5–100 kg | 0.5–100 kg | 3–38 kg |
| Marijuana | 67–9979 kg | 450–4989 kg | 67–9979 kg |
| Amphetamines (yield) | 20 kg | 20 kg | — |
| Opium | 2.2 kg | 2.2 kg | — |

* Petitioner is non-white, was born outside of Canada, and is requesting transfer to Canada. His offense involved 38 kg heroin, his base offense level is 36, total offense level is 38, and sentence is 235 months.
** Petitioner's claim is that he was discriminated against due to his Oriental race and national origin. See supra n. 4 for an explanation of how "Oriental," as a subset of non-white, was determined.