# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 6, 2018          Decided July 31, 2018

No. 16-5373

MATTHEW SLUSS,
APPELLANT

v.

UNITED STATES DEPARTMENT OF JUSTICE, INTERNATIONAL
PRISONER TRANSFER UNIT,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00759)

---

*Dominique Rioux*, Student Counsel, argued the cause as *amicus curiae* in support of appellant. With her on the briefs were *Erica Hashimoto*, appointed by the court, and *Benjamin Kurland*, Student Counsel.

*Matthew D. Sluss*, *pro se*, filed the briefs for appellant.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Jessie K. Liu*, U.S. Attorney, and *R. Craig Lawrence* and *Johnny H. Walker*, Assistant U.S. Attorneys. *Joshua L. Rogers*, Trial Attorney, entered an appearance.

Before: ROGERS, SRINIVASAN, and WILKINS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  This appeal is before the court in an unusual procedural posture.  Matthew Sluss is a dual citizen of the United States and Canada, incarcerated in the United States upon conviction of a felony.  He seeks a transfer under a treaty between the United States and Canada to a Canadian prison where his term of imprisonment would apparently be reduced and his monetary allowance increased.  He now appeals the dismissal of his complaint under the Administrative Procedure Act alleging that the denial of his transfer application was arbitrary and capricious because based on improper factors.  The government contends the Treaty is not self-executing and is not, therefore, part of domestic law, so Sluss must rely exclusively on the implementing statute, which the government maintains vests unbounded, unreviewable discretion of prisoner transfers in the Attorney General.

For the following reasons, we hold:  First, the government's self-execution argument is non-jurisdictional and therefore does not affect the court's subject matter jurisdiction to consider Sluss's case under 28 U.S.C. § 1331.  Second, even assuming the treaty is not self-executing, the government's position that Sluss must rely exclusively on the implementing legislation is flawed.  The text and legislative history of the treaty and the legislation show that the latter incorporates the substantive standards of the former, making those standards part of domestic law.  Third, the treaty provision on which Sluss relies provides law to apply, although the scope of judicial review is narrow, limited to the terms of that provision and not reaching the correctness of the

assessment or the outcome. Fourth, consistent with the narrow scope of judicial review, the denial of Sluss's transfer was not arbitrary and capricious. Accordingly, we affirm.[*]

## I.

The Treaty on the Execution of Penal Sentences between the United States and Canada permits prisoners "to serve sentences of imprisonment . . . in the country of which they are citizens, thereby facilitating their successful reintegration into society." Preamble, 30 U.S.T. 6263 (1978) (the "Treaty"). Its purposes are basically two-fold: (1) to promote rehabilitation of individuals incarcerated away from their home countries who face linguistic, familial, cultural, educational, employment, and parole-related barriers by allowing transfers to a prison in their home country and thus permit their successful reintegration into society; and (2) to promote diplomatic and law enforcement relations by relieving strains that arise from imprisonment of large numbers of foreign nationals. *See, e.g.*, S. REP. No. 95-10, at 1–2, 9 (July 15, 1977) (executive report); S. REP. No. 95-435, at 14 (Sept. 15, 1977) (views of Griffin B. Bell, U.S. Att'y Gen.); H.R. REP. No. 95-720, at 26 (Oct. 19, 1977); *id.* at 7 (Letter of Submittal of Treaty to the President, Cyrus A. Vance, Sec'y of State); 95 Cong. Rec. 23,729 (1977) (statement of the Chair, Senate Foreign Relations Committee). The Treaty was ratified by the Senate on July 19, 1977, and by the President on August 4, 1977, and, following Canadian ratification, "entered into force" July 19, 1978.

Relevant here is article III of the Treaty. Section 1 of that article provides: "Each Party shall designate an authority to

---

[*] The court expresses appreciation for the assistance provided by *amicus curiae*.

perform the functions provided in this Treaty." Section 6 provides: "In deciding upon the transfer of an Offender, the authority of each Party shall bear in mind all factors bearing upon the probability that transfer will be in the best interests of the Offender." Section 9 provides: "Each Party shall establish by legislation or regulation the procedures necessary and appropriate to give legal effect within its territory to sentences pronounced by courts of the other Party."

On October 28, 1977, Congress enacted the Transfer of Offenders to or from Foreign Countries Act ("Transfer Act"), 18 U.S.C. § 4100 *et seq.* It "authorized" the Attorney General "to act on behalf of the United States as the authority referred to in [the Treaty]," to receive and transfer prisoners, and to issue implementing regulations. 18 U.S.C. § 4102 (1)–(4). It also provided procedures for prisoner transfers as contemplated by Section 9.

Sluss pleaded guilty in the United States District Court for the District of Maryland to one count of advertising child pornography in violation of 18 U.S.C. § 2251(d), and in 2012 he was sentenced, in view of two prior convictions of sexually assaulting children, to 396 months' imprisonment (33 years) with lifetime supervised release thereafter. On July 2, 2013, Sluss, who has dual citizenship in the United States and Canada, applied for transfer under the Treaty to a Canadian prison. The Attorney General (acting by delegation to the Criminal Division, *see* 18 U.S.C. § 4102(11); 28 C.F.R. § 0.64-2) denied his application and his request for reconsideration. On April 28, 2014, Sluss filed a petition for habeas corpus in the federal district court, alleging that the Attorney General considered factors beyond the scope of Section 6 of the Treaty and consequently the denial of his transfer was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). He sought a

writ of mandamus, 28 U.S.C. § 1361, to compel the Attorney General to reconsider his application "based solely . . . upon permiss[i]ble factors as contemplated" by Section 6. Compl. at 29.

The district court treated Sluss's petition as a civil complaint in view of his request for relief under the APA, and dismissed it on the ground that prisoner transfer decisions "constitute agency action committed to agency discretion by law" and are thus judicially unreviewable. *Sluss v. U.S. Dep't of Justice*, 78 F. Supp. 3d 61, 64 (D.D.C. Jan. 13, 2015) (quoting *Bagguley v. Bush*, 953 F.2d 660, 662 (D.C. Cir. 1991)). Upon Sluss's appeal, this court remanded for the district court to address whether Sluss was entitled to relief under the Treaty, as distinct from the different treaty addressed in *Bagguley*. Order, *Sluss v. U.S. Dep't of Justice*, No. 15-5075, 2015 WL 6153951 (D.C. Cir. Oct. 6, 2015). On remand, the district court concluded that Section 6 of the Treaty lacked a "sufficiently objective standard by which to review" the Attorney General's transfer decisions, and, alternatively, that the Attorney General had "clearly considered factors related to [Sluss's] best interests" under Section 6. *Sluss v. U.S. Dep't of Justice*, No. 14-cv-0759, 2016 WL 6833923, at *3 & n.2 (D.D.C. Nov. 18, 2016) ("*Sluss II*").

Sluss appeals, and our review of the dismissal of his complaint is *de novo*. *De Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013).

## II.

Sluss has alleged the violation of his rights under Section 6 of the Treaty, which was duly signed by the President and ratified by the Senate. *See* U.S. CONST. art. 2, § 2, cl. 2. Under 28 U.S.C. § 1331, "[t]he district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

The government maintains on appeal, however, that the Treaty is not self-executing. Appellee Br. 13. While a self-executing treaty "operates of itself without the aid of any legislative provision," and thus "automatically ha[s] effect as domestic law," *Medellin v. Texas*, 552 U.S. 491, 504–05 (2008), a non-self-executing treaty "can only be enforced pursuant to legislation," *id.* (citation omitted). Non-self-executing treaties constitute "international law commitments," but are not themselves part of "binding federal law." *Id.* at 504; *see Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 937, 942–43 (D.C. Cir. 1988). The government's view is that because the Treaty is not self-executing, it is not part of binding federal law and therefore cannot form the basis of Sluss's claim. Rather, Sluss must rely "exclusively" on the Transfer Act as "the source of domestic law governing the treaty's provisions," which, the government states, "commits international prisoner-transfer decisions to agency discretion" and provides no law to apply. Appellee Br. at 18–19 (quoting *Bagguley*, 953 F.2d at 662; 5 U.S.C. § 701(a)(2)).

The government did not raise the self-execution argument in the district court. There it argued that the Treaty did not provide a private right of action or a cognizable liberty interest such that Sluss lacks standing under Article III of the Constitution, and that the Treaty vested the Attorney General with unbounded, judicially unreviewable discretion in considering transfer requests. These arguments are distinct from the question whether a treaty forms part of domestic federal law. *See Medellin*, 552 U.S. at 506 n.3. The government's self-execution argument would ordinarily be forfeit, *see Lesesne v. Doe*, 712 F.3d 584, 588 (D.C. Cir. 2013),

unless this court concludes that the question of a treaty's self-execution is a non-forfeitable jurisdictional issue. We conclude it is not.

In determining whether self-execution presents a jurisdictional issue, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), provides guidance. There the Supreme Court observed that "[i]t is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Id.* at 89. For instance, in *Bell v. Hood*, 327 U.S. 678, 682 (1946), the Court explained that "[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Rather, the district court has jurisdiction if "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another." *Id.* at 685. In *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974), the Court held that dismissal for lack of subject matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." This court has likewise appreciated the distinction between jurisdiction and cause of action. For instance, in *Doe v. Metro. Police Dep't of D.C.*, 445 F.3d 460, 466 (D.C. Cir. 2006), the court held the dismissal for lack of subject matter jurisdiction of a complaint brought pursuant to 42 U.S.C. § 1983 was error because "section 1983 itself provides the basis for federal question jurisdiction under 28 U.S.C. § 1331," while the "failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal

for want of jurisdiction." See also *Apton v. Wilson*, 506 F.2d 83, 95–96 & n.16 (D.C. Cir. 1974).

By analogy to the distinction between subject matter jurisdiction and cause of action, we conclude that whether a treaty is self-executing does not present a jurisdictional issue regarding the court's power to hear a case; rather, that inquiry relates to whether the plaintiff has a cause of action. Our sister circuits have reached a like conclusion. In *Jogi v. Voges*, 480 F.3d 822, 824–26 (7th Cir. 2007), the Seventh Circuit confronted the question whether there was a remedy in a U.S. court where the plaintiff alleged that officials failed to inform him of his rights under the Vienna Convention on Consular Relations. The district court dismissed the case. The Seventh Circuit held that the court had subject matter jurisdiction under 28 U.S.C. § 1331, and further that the plaintiff had a remedy under 42 U.S.C. § 1983, without reaching the question whether the Vienna Convention provided a private remedy. "At bottom, [the plaintiff] is complaining about police action, under color of state law, that violates a right secured to him by a federal law (here, a treaty)." *Id.* at 825. The court thus distinguished the inquiry regarding the existence of a cause of action from that of subject matter jurisdiction, confirming that a claim arising under a treaty "is enough to support subject matter jurisdiction unless the claim is so plainly insubstantial that it does not engage the court's power." *Id.* By contrast, the court treated the question of self-execution as one of several non-jurisdictional "hurdles that must be overcome before an individual may assert rights in a § 1983 case under a treaty." *Id.* at 827. The Third Circuit's decision in *Ogbudimpka v. Ashcroft*, 342 F.3d 207, 209 (3d Cir. 2003), is to the same effect. The court held there was subject matter jurisdiction under Section 1331 to hear a Section 1983 claim alleging violations of the United Nations Convention Against Torture, notwithstanding congressional legislation "purporting to cabin

[the U.N. Convention] as non-self-executing," *id.* at 218 n.22 (citing *Dreyfus v. Von Finck*, 534 F.2d 24, 28, 30 (2d Cir. 1976)); the effect of the legislation, the court explained, is that the treaty "does not provide a cause of action," *id.*

Non-self-executing treaties are much like federal statutes that do not supply a private cause of action.  Although both are enactments that create legal obligations, plaintiffs cannot bring claims under either.  As such, a helpful guide in assessing whether self-execution is a jurisdictional issue may be whether the existence of a cause of action is a jurisdictional issue.  The Supreme Court has repeatedly answered the latter question in the negative, holding that "whether a federal statute creates a claim for relief is not jurisdictional." *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 365 (1994) (citing *Air Courier Conf. of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 523 & n.3 (1991); *Burks v. Lasker*, 441 U.S. 471, 476 & n.5 (1979); *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 278–79 (1977); *Bell*, 327 U.S. at 682).  Other circuits have drawn the same analogy between self-execution and the existence of a cause of action, holding that because the latter is not jurisdictional, neither is the former. *See Ogbudimkpa*, 342 F.3d at 218 n.22; *Dreyfus*, 534 F.2d at 28, 30.

The government's self-execution argument on appeal, therefore, does not relate to the court's subject matter jurisdiction, but rather to whether Sluss has a cause of action. Because the question of self-execution is non-jurisdictional, the court need not decide whether the Treaty is self-executing.  The court has jurisdiction under 28 U.S.C. § 1331, and the government does not suggest Sluss's claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous," *Steel Co.*, 523 U.S. at 89 (quoting *Bell*, 327 U.S. at 682–83), or that it is "so insubstantial, implausible, foreclosed

by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy," *id.* (quoting *Oneida Indian Nation*, 414 U.S. at 666). For purposes of this appeal, the court can treat the Treaty as forming part of binding domestic law.

## III.

Alternatively, even assuming, as the government maintains, that the Treaty is not self-executing, the government's position that Sluss must rely "exclusively" on the Transfer Act for his claim, Appellee Br. 18, misstates the relationship between the Treaty and the Act.

As noted, the government raised its self-execution argument for the first time on appeal and offers no explanation as might normally excuse its forfeiture. *See Lesesne*, 712 F.3d at 588 (citations omitted). But the court is confronted with litigation that invokes an international agreement between the United States and Canada. Traditionally, courts tread lightly in matters involving foreign affairs, giving due consideration to the government's understanding of its related obligations. *See, e.g.*, *Zivotofsky v. Clinton*, 566 U.S. 189, 212–15 (2012) (Breyer, J., dissenting) (collecting cases); *Dames & Moore v. Regan*, 453 U.S. 654, 660–61 (1981); *El-Shifa Pharm. Ind. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010). Before addressing the merits of Sluss's appeal, therefore, it behooves the court to consider the government's self-execution argument in one limited respect.

In the government's view, the significant consequence of concluding the Treaty is non-self-executing is that Sluss must rely "exclusively" on the Transfer Act as "the source of domestic law governing the treaty's provisions." Appellee Br. 18–19. That conclusion misstates the relationship between the

Treaty and the Act. The Transfer Act is not in derogation of the Treaty; to the contrary, it implements and incorporates the Treaty, making its provisions (including the one on which Sluss relies) part of domestic law. *See Medellin*, 552 U.S. at 505–06; *cf. Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 177–79 (1993).

The text of the Treaty indicates that certain action was needed to carry out the Treaty, including designating an "authority to perform the functions provided in this Treaty," and providing procedures to ensure "sentences pronounced by the courts of" Canada are "give[n] legal effect" in the United States. Treaty, art. III, §§ 1, 9; *see also id.* art. V. The Treaty's ratification history shows that the executive and legislative branches expressly contemplated that implementing legislation was necessary. S. REP. No. 95-435, at 9; *id.* at 14–15 (views of Att'y Gen. Bell); H.R. REP. No. 95-720, at 1, 25–26; *id.* at 8 (letter of Sec'y Vance); *id.* at 48 (statement of Dep. Att'y Gen. Peter F. Flaherty); *id.* at 54 (statement of Dep. Sec'y of State Warren Christopher); S. REP. No. 95-10, at 18 (executive report). Indeed, the Senate, by Resolution, gave its advice and consent to the Treaty subject to the declaration that the United States "will not deposit its instrument of ratification until after the implementing legislation referred to in [a]rticle III has been enacted." S. REP. No. 95-10, at 18 (executive report); *see* H.R. REP. No. 95-720, at 48 (Flaherty statement); *id.* at 53 (Christopher statement).

The Transfer Act takes an omnibus approach to prisoner transfers, providing procedures to implement this Treaty and a similar prisoner-transfer treaty with Mexico, as well as future prisoner-transfer agreements with other countries. *See* S. REP. No. 95-435, at 9; *id.* at 14–15 (views of Att'y Gen. Bell); H.R. REP. No. 95-720, at 1, 26; *id.* at 48 (Flaherty statement). It is "applicable only when a treaty providing for such transfer is in

force." 18 U.S.C. § 4100(a). It designates the Attorney General as the "author[ity]" to "act on behalf of the United States as the authority referred to in a treaty," *id.* § 4102(1), and authorizes the Attorney General to transfer and receive offenders and to issue implementing regulations, *id.* § 4102(2)–(4). It further sets forth the procedures by which offenders shall be received into custody and transferred to the authority of the other party to the treaty. For example, the Transfer Act addresses transfer of juveniles and offenders on probation and parole, *id.* §§ 4104, 4106, 4106A, 4110; the length of sentence and conditions of confinement, *id.* § 4105; verification of prisoner consent to transfer, *id.* §§ 4107–4109; and bars transfer while a direct appeal or collateral attack is pending, *id.* § 4100(c).

The Transfer Act does not, however, "provide *substantive* guidelines by which the Attorney General should exercise his discretion" in consideration of transfer applications. *Scalise v. Thornburgh*, 891 F.2d 640, 645 (7th Cir. 1989) (emphasis added). Rather, the text and legislative history of the Transfer Act confirm that in considering a transfer application, the Attorney General must look for substantive direction to the Treaty itself. *See* 18 U.S.C. § 4100(a); Treaty, art. III, § 1. Turning to the substantive standard the Treaty sets forth, the question is whether the application of that standard is committed to the discretion of the Attorney General or instead is subject to judicial review.

## IV.

Sluss filed his complaint under the APA, which provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," 5 U.S.C. § 702, unless the challenged "agency action

is committed to agency discretion by law," *id.* § 701(a)(2). The question thus becomes whether Section 6 of the Treaty on which Sluss relies provides "law to apply" that provides a "judicially manageable" standard. *Heckler v. Chaney*, 470 U.S. 821, 828–30 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1970). The district court acknowledged Section 6's use of the word "shall" and its directive to "bear in mind" the prisoner's "best interests," but concluded they indicated neither "what these factors are or how much weight they should be given," nor that the Attorney General was precluded from considering unrelated factors. *Sluss II*, 2016 WL 6833923, at *3. Absent a "cabin[ing]" of the Attorney General's discretion "in any meaningful way," the district court ruled that transfer decisions under the Treaty are not subject to judicial review. *Id.*

The framework for deciding whether there is law to apply is explained in *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645 (2015). That case involved the requirement in Title VII that the Equal Employment Opportunity Commission ("EEOC") "*shall endeavor* to eliminate [the] alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion" before deciding whether to bring an enforcement action. 42 U.S.C. § 2000e-5(b) (emphasis added). After investigating a complaint of sex discrimination in hiring, the EEOC engaged in conciliation, ultimately concluded that "'such conciliation efforts as are required by law have occurred and have been unsuccessful' and that any further efforts would be 'futile,'" and brought an action in federal court against the employer. *Mach Mining*, 135 S. Ct. at 1650. The Supreme Court held that the EEOC's effort at conciliation under Section 2000e-5(b) was judicially reviewable. Despite Congress's decision to vest "the EEOC with wide latitude over the conciliation process," the Court observed that "Congress has not left *everything* to the

Commission." *Id*. at 1652 (emphasis in original). Had the EEOC declined to make any attempt at conciliation and instead taken the employer straight to court, Title VII would provide a "perfectly serviceable standard for judicial review: Without any 'endeavor' at all, the EEOC would have failed to satisfy a necessary condition of litigation." *Id.* The Court further concluded that Title VII provided "concrete standards pertaining to what that endeavor must entail," such as "communication between the parties, including the exchange of information and views." *Id.* Because "legal lapses and violations occur, and especially so when they have no consequence," the Court noted that it "has so long applied a strong presumption favoring judicial review of administrative action." *Id*. at 1652–53.

By parity of reasoning, there is sufficient law to apply under Section 6 of the Treaty. "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin*, 552 U.S. at 506–07. Section 6 includes the mandatory, not precatory, "shall" as it is followed by a directive to "bear in mind" the factors relating to the prisoner's "best interests." "Courts routinely enforce . . . compulsory [directives]." *Mach Mining*, 135 S. Ct. at 1651. Although the directive in Section 6 may vest the Attorney General with "wide latitude" over prisoner transfers, the Treaty "has not left *everything* to the [Attorney General]." *Id.* at 1652 (emphasis in original). Section 6 requires that "the authority of each Party shall bear in mind" the "best interests of the Offender," and just as words in a statute are understood in their context, *see Holloway v. United States*, 526 U.S. 1, 7 (1999) (citations omitted), the directive is properly understood in the context of at least the Treaty's purpose of prisoner rehabilitation. *See infra* Part V. That is, the Attorney General must consider "all factors" relating to the prisoner's "best interests," and in doing so consider how those interests dovetail with the Treaty's

rehabilitative purpose. Such "concrete standards" are sufficient to apprise a court of what the Attorney General's "endeavor must entail." *Mach Mining*, 135 S. Ct. at 1652. The Treaty thus differs from that addressed in *Bagguley*, which this court concluded "provides no criteria to govern the sentencing state's decision," 953 F.2d at 662 n.2, and so precluded judicial review.

Still, although there is some "law to apply," the scope of judicial review is narrow. Again *Mach Mining* provides guidance. There, the Supreme Court concluded that judicial review of the EEOC's effort at conciliation was a "barebones review," confined to the terms of the conciliation provision, that "allows the EEOC to exercise all the expansive discretion Title VII gives it to decide how to conduct conciliation efforts and when to end them." 135 S. Ct. at 1655–56. Here, then, the court's review is appropriately limited to ensuring that the Attorney General addressed the terms of Section 6, while allowing the exercise of broad discretion in determining whether to approve a transfer application. Section 6's "probab[ilistic]" inquiry — "bear in mind all factors bearing upon the probability that transfer will be in the best interests of the Offender" — underscores the narrow nature of review, for Congress has determined that judgment is properly left to the Attorney General. 18 U.S.C. § 4102(1). This court has acknowledged that "a broad grant of discretionary authority is particularly appropriate to prison transfer decisions, depending as they do on a variety of considerations," both domestic and international. *Bagguley*, 953 F.2d at 662. The Attorney General must consider the prisoner's "best interests" in determining whether to approve a transfer application, but contrary to Sluss's view, *see* Appellant Br. 9, Section 6 does not limit consideration *only* to those interests. Nor does the court's review reach the correctness of the Attorney General's

assessment of the factors considered or of the ultimate decision whether to transfer.

## V.

In denying Sluss's transfer application, the Attorney General explained that, "[a]fter considering all of the appropriate factors . . . , the United States has denied the request to transfer to Canada . . . because of the seriousness of the offense, because the applicant has become a domiciliary of the United States, because the prisoner is a poor candidate due to his criminal history[,] and because the prisoner has insufficient contacts with the receiving country." Letter, Paula A. Wolf, Chief, Int'l Prisoner Transfer Unit, Crim. Div., U.S. Dep't of Justice (hereinafter "Wolf"), to Chris Hill, Instit'l Reintegration Ops., Corr'l Serv., Canada (Mar. 5, 2014). Further explanation was provided in denying Sluss's request for reconsideration. Pointing to one of the Treaty's purposes — "to relieve the special hardships faced by prisoners who are incarcerated in a foreign country far from their family and friends, [including] cultural differences and difficulty in maintaining contact with family in the home country, and difficulty in speaking a foreign language in prison" — the Attorney General advised that such hardships are "inapplicable to an inmate [such as Sluss] who has resided in the United States for a lengthy period of time with the intention to remain in this country, and whose immediate family members are living here." Wolf Letter to Matthew Sluss (Aug. 12, 2014).

Sluss contends that a transfer to a Canadian prison would be in his "best interests": He would receive a reduced term of imprisonment and a greater monetary allowance. *See* Compl. at 23; Letter from Corinne Vitozzi, Senior Analyst, Intern'l Transfers Unit, Corr. Serv., Canada, to Matthew Sluss (Dec. 21, 2015). His interpretation seeks to limit the Attorney

General's discretion without regard to the Treaty's purposes. *See supra* Part I. Neither the text of Section 6 nor the ratification history of the Treaty supports Sluss's interpretation that his personal interests are dispositive. Viewed in light of the Treaty's rehabilitative purpose, the Attorney General properly considered factors such as Sluss's long-term U.S. domicile, the U.S. residency of his family, his insubstantial contacts with Canada, and the absence of language, cultural, or familial hardships. Sluss's reference to a shorter sentence and greater monetary allowance in Canada may be in his "best interests" *personally*, but the Attorney General concluded those factors are neither determinative nor necessarily significant even if relevant to the rehabilitative purpose of the Treaty.

Finally, Sluss seeks to supplement the record before this court with pre-decisional documents on his transfer request, recently obtained pursuant to the Freedom of Information Act in redacted form. Sluss does not suggest that the Attorney General failed to consider his "entire" record. *See, e.g.,* H.R. REP. No. 95-720, at 7 (letter of Sec'y Vance); S. REP. No. 95-435, at 14 (views of Att'y Gen. Bell). Rather, Sluss argues that the district court needed to review the entire administrative record. But he overlooks the limited scope of judicial review. The pre-decisional documents presented by Sluss confirm, even though heavily redacted, that the Attorney General considered factors relating to Sluss's "best interests" in light of the rehabilitative purpose of the Treaty, namely, his offense summary, criminal history, and the nature and extent of his and his family's contacts with Canada and the United States. The Attorney General could properly rely on the Justice Department's records and the record Sluss presented with his application for transfer. Under the circumstances, there is no need to supplement the record.

Accordingly, we affirm the order dismissing the complaint.