# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 10, 2023          Decided July 18, 2023

No. 22-5068

JENNY SCHIEBER,
APPELLANT

v.

UNITED STATES OF AMERICA,
APPELLEE

———

Consolidated with 22-5118, 22-5141, 22-5151, 22-5152,
22-5159, 22-5160, 22-5163

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-01371)
(No. 1:20-cv-00263)
(No. 1:20-cv-00266)
(No. 1:20-cv-00260)
(No. 1:20-cv-00265)

———

*Noam Schreiber* argued the cause for appellants. With him on the briefs was *L. Marc Zell*. *Marc E. Miller* entered an appearance.

*Anna O. Mohan*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Sharon Swingle*, Attorney.

Before: MILLETT and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The United States and the French Republic agreed to establish a fund for compensating non-French nationals who were deported from France to concentration camps during the Holocaust. The Department of State, which administers the fund, denied compensation to the plaintiffs here. They seek judicial review under the Administrative Procedure Act. We hold that the political question doctrine does not bar review. But because administration of the fund is committed to agency discretion by law, the APA provides no cause of action.

I

A

During World War II, France's Vichy government collaborated with the Nazis to deport nearly 76,000 Jews to concentration camps. Most of them never returned. In the decades since, France has established several programs to compensate Holocaust victims and their families. One such program is the focus of this case.

In 2014, the United States and France reached an Agreement to settle all Holocaust deportation claims against France. France agreed to pay $60 million to establish a compensation fund to cover such claims. In return, the United

States agreed to secure the dismissal of any pending or future Holocaust deportation claims against France in United States courts. The Agreement excludes claims of both French nationals, who receive other benefits, and non-French nationals eligible to receive compensation under other programs.

Article 6 of the Agreement governs distribution of the settlement fund. It requires the United States to distribute the fund "according to criteria which it shall determine unilaterally, in its sole discretion, and for which it shall be solely responsible." J.A. 18. At the same time, it requires the United States to consider the Agreement's objectives in formulating distribution criteria and to reject all excluded claims. In deciding whether these exclusions apply, the United States "shall rely" on a claimant's sworn declaration of nationality and ineligibility for other compensation programs, "as well as on any relevant information obtained under" an information-sharing provision. *Id.*

Article 8 of the Agreement governs the resolution of disputes. It states that "[a]ny dispute arising out of the interpretation or performance of this Agreement shall be settled exclusively by way of consultation between the Parties"—*i.e.*, by diplomacy between the United States and France. J.A. 19.

The State and Treasury Departments are responsible for disbursing funds received from foreign governments to settle claims. A standing appropriation directs the Secretary of State to "determine the amounts due claimants" and then requires the Secretary of the Treasury to "pay the amounts so found to be due." 22 U.S.C. § 2668a. The State Department ultimately approved 386 of the 867 claims filed under the Agreement.

4

B

The plaintiffs are six of the unsuccessful claimants. Four plaintiffs (Jenny Schieber, Solange Faktor, Esther Gutrejman, and Simon Bywalski) filed claims on behalf of a parent or step-parent whose spouse was deported to Auschwitz and then killed. The State Department rejected these claims because, in its view, the plaintiffs had not adequately proven eligibility for compensation under the Agreement. The other two plaintiffs (Louis Schneider and Regina English) filed claims on their own behalf. The State Department denied their claims after determining that they likely had been deported by Italian rather than French authorities.

The plaintiffs sued to challenge the denials under the APA. In separate actions, Schieber, Faktor, Gutrejman, and Bywalski argued that the Agreement required the State Department to credit their affidavits about their deceased parents' nationalities and ineligibility for other Holocaust compensation programs. In one lawsuit, Schneider and English challenged the Department's finding that Italy controlled the region from which they had been deported.

The government moved to dismiss the complaints for lack of jurisdiction and failure to state a claim. In *Gutrejman*, *Bywalski*, and *Schneider*, the courts held that the claims raise nonjusticiable political questions because the Agreement requires disputes to be resolved through diplomacy. *Gutrejman v. United States*, 596 F. Supp. 3d 1, 9–10 (D.D.C. 2022); *Bywalski v. United States*, No. 1:20-cv-265, 2022 WL 1521781, at *4–5 (D.D.C. May 13, 2022); *Schneider v. United States*, No. 1:20-cv-260, 2022 WL 1202427, at *4–5 (D.D.C. Apr. 22, 2022). In *Schieber* and *Faktor*, the courts skipped over the political question doctrine and dismissed the claims on the merits. These courts held that because the Agreement bars

judicial review, the APA provides no cause of action. *Faktor v. United States*, 590 F. Supp. 3d 287, 292–94 (D.D.C. 2022); *Schieber v. United States*, No. 1:21-cv-1371, 2022 WL 227082, at *5–7 (D.D.C. Jan. 26, 2022).

II

Two of the district courts concluded that they could reserve judgment on whether the cases present nonjusticiable political questions. The other three concluded that the claims do present such questions. We disagree with both conclusions.

A

Start with the sequencing issue. This Court repeatedly has held that the political question doctrine implicates the subject-matter jurisdiction of Article III courts. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 7–8 (D.C. Cir. 2019). In contrast, the existence of a cause of action under the APA goes to the merits. *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523 n.3 (1991); *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011). The *Schieber* and *Faktor* courts thus skipped over a jurisdictional issue to rule on a merits one.

In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court reaffirmed that a federal court must confirm its subject-matter jurisdiction before reaching the merits. *Id.* at 95. *Steel Co.* firmly rejected the doctrine of "hypothetical jurisdiction," under which a court would skip over difficult jurisdictional questions if it could more simply rule on the merits against the party invoking its jurisdiction. *See id.* at 93–94. As the Supreme Court explained, hypothetical jurisdiction "produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion." *Id.* at 101; *see also Cross-Sound Ferry*

*Servs. v. ICC*, 934 F.2d 327, 339–46 (D.C. Cir. 1991) (Thomas, J., concurring in part and concurring in the judgment).

The district courts in *Schieber* and *Faktor* bypassed the jurisdictional question because, in their view, a few of this Court's decisions skipped over the political question doctrine when it was easier to rule against plaintiffs on the merits. *See Schieber*, 2022 WL 227082, at *5 (citing *Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 934 (D.C. Cir. 1988) and *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206 (D.C. Cir. 1985)); *Faktor*, 590 F. Supp. 3d at 292 (relying on *Schieber*). But these decisions predate *Steel Co.* and are premised on the same theory of hypothetical jurisdiction that *Steel Co.* repudiated. Under current law, they cannot justify skipping over jurisdiction to reach the merits.

The government suggests a different approach. It contends that we may skip over the political question issue because the cause-of-action question is "plainly insubstantial" within the meaning of *Norton v. Mathews*, 427 U.S. 524, 532 (1976). There, the Court skipped over a jurisdictional issue because the merits question—which was decided in a companion case— had become "no longer substantial in the jurisdictional sense." *See id.* at 530–31. *Steel Co.* preserved this exception for cases where existing precedent "foreordained" the merits. 523 U.S. at 98. And we have since applied the exception. *Sherrod v. Breitbart*, 720 F.3d 932, 936–37 (D.C. Cir. 2013). As explained below, we agree that the plaintiffs' claims lack merit. But because the claims cannot fairly be characterized as "plainly insubstantial," we must first resolve the political question issue.

## B

The political question doctrine traces to the case-or-controversy requirement of Article III. *See Allen v. Wright*,

468 U.S. 737, 750 (1984).  In its canonical formulation, the doctrine bars federal courts from exercising jurisdiction over claims that involve any of six different factors:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962) (cleaned up).  But in *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012), the Supreme Court stressed the doctrine's "narrow" scope.  *Id.* at 195.  And it mentioned only the first two *Baker* factors, *id.*, despite separate opinions pointedly noting the omission of the final four, *see id.* at 202–07 (Sotomayor, J., concurring in part and concurring in the judgment); *id.* at 212 (Breyer, J., dissenting).  We too have characterized the first two factors as "the most important" ones, *Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008), and the last four as merely "prudential," *Al-Tamimi*, 916 F.3d at 12.

Disputes involving foreign relations often raise political questions, but not always.  Such disputes "frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or

legislature." *Baker*, 369 U.S. at 211. Yet not every controversy that "touches foreign relations" has these characteristics. *Id.* So we must always consider "the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Id.* at 211–12.

*Zivotofsky* is a useful illustration. A statute allowed Americans born in Jerusalem to elect to have "Israel" listed as the country of birth on their passports. When a plaintiff sued to enforce the statute, the government argued that the lawsuit presented a nonjusticiable political question under Article III and that, at any rate, the statute unconstitutionally impinged on the President's Article II powers. 566 U.S. at 191–93. The Supreme Court rejected the former contention. It explained that the plaintiff had not asked the courts to decide "whether Jerusalem is the capital of Israel," but instead only "whether he may vindicate his statutory right." *Id.* at 195. The latter question turned on whether the statute was constitutional, and the Constitution did not textually commit that issue to the Executive Branch. *Id.* at 197. Moreover, the Article II question turned on "familiar" kinds of legal arguments about constitutional text, structure, history, and purpose. *Id.* at 197–201. Thus, it did not "turn on standards that defy judicial application." *Id.* at 201 (quoting *Baker*, 369 U.S. at 211).

The claims here are likewise justiciable. To start, resolving these cases would not impinge on foreign relations matters constitutionally committed to the Executive Branch. Under the Agreement, France was obliged to make a lump-sum payment—with no reversionary interest—and to provide information that would help implement the program. That is all. No doubt, the Executive is responsible for managing this Nation's relationship with France. But reviewing the State

Department's compensation decisions would say nothing about France or its performance under the Agreement. The only foreign-relations wrinkle is that the yardstick against which we would measure the Department's actions is an international agreement rather than a statute or regulation. But that is hardly enough to transform the legal and factual questions in these cases into political ones. After all, courts routinely interpret treaties and executive agreements, including those that involve the disposition of claims settlement funds. *See*, *e.g.*, *Medellín v. Texas*, 552 U.S. 491 (2008); *Dames & Moore v. Regan*, 453 U.S. 654 (1981); *United States v. Pink*, 315 U.S. 203 (1942); *United States v. Belmont*, 301 U.S. 324 (1937); *Mellon v. Orinoco Iron Co.*, 266 U.S. 121 (1924).

There are also judicially manageable standards for resolving the claims. These claims involve not the design, but the administration of a foreign claims settlement scheme set out in an international agreement. Four plaintiffs assert that the Agreement required the State Department to credit affidavits about their parents' ineligibility for other compensation. They also contend that the Department arbitrarily accepted some affidavits but not others. Resolving these questions would require us to interpret the terms of a written legal instrument and to decide whether the Department treated like claims alike. Two plaintiffs claim that the Department erred in finding that they were likely deported by Italian rather than French or German officials. Resolving that contention would require us to assess whether an agency's finding of fact was adequately supported in an administrative record. There is nothing unusual or awkward about the courts resolving such questions.[1]

---

[1] We need not consider whether the political question doctrine would bar review of an Executive determination about which country has sovereignty over disputed territory during ongoing hostilities.

The claims here also tee up a host of threshold legal issues about the status of the Agreement under domestic law and about how the Agreement interacts with federal statutes. Is the Agreement self-executing? Does the APA provide a vehicle for enforcing a non-self-executing international agreement? To what extent does section 2668a execute the Agreement? Are the claims here unreviewable under the APA? To be sure, these questions arise in a foreign-policy context. But like the Article II question in *Zivotofsky*, they are legal ones—which turn on familiar legal considerations such as text, structure, and history. In short, the questions presented in these cases do not turn on standards that defy judicial application.

Finally, none of the prudential factors cuts the other way. These factors reflect a concern that the "Judiciary should be hesitant to conflict with the other two branches." *Al-Tamimi*, 916 F.3d at 12. Because these cases implicate foreign relations only at their outermost edges, adjudicating them would risk no interbranch conflict in that area. Furthermore, because the Executive Branch is best able "to understand the foreign policy ramifications of the court's resolution of a potential political question," its position is "highly relevant" to our consideration of the prudential factors, and its assessment of any specific foreign-policy harms would be "owed deference." *See id.* at 13. Here, the government's position has undergone a full shift: Despite urging application of the political question doctrine below, and despite remaining agnostic on that question in its brief in this Court, the government at oral argument affirmatively took the position that this case does *not* involve any political question. We must of course resolve that jurisdictional question for ourselves, *see Steel Co.*, 523 U.S. at 95, but we see no reason to disagree with the government's current position.

The district courts in *Gutrejman*, *Bywalski*, and *Schneider* concluded otherwise. They reasoned that the claims here are nonjusticiable because the Agreement requires any disputes to be resolved through diplomacy. *Gutrejman*, 596 F. Supp. 3d at 10; *Bywalski*, 2022 WL 1521781, at *5; *Schneider*, 2022 WL 1202427, at *5. For support, they invoked *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), which likewise involved an international agreement requiring disputes to be resolved through diplomacy. But our disposition in *Holmes* rested on considerations that are not present here.

*Holmes* involved a Status of Forces Agreement (SOFA) that allowed Germany to exercise criminal jurisdiction over United States military personnel stationed there. After being convicted of attempted rape in Germany, two American soldiers sued to prevent the United States from transferring them back to Germany to serve their sentences. The soldiers argued that the United States had no transfer obligation because Germany had violated its obligation to afford certain procedural protections during their trials. 459 F.2d at 1214. We held that this claim was nonjusticiable because federal courts lack power to decide how the Executive Branch should respond to another sovereign's alleged failure to comply with a non-self-executing international agreement. *Id.* at 1220–22.

The district courts read *Holmes* to say that the soldiers' claim was nonjusticiable because the SOFA was not self-executing. That oversimplifies our reasoning. In concluding that the claim was nonjusticiable, we first explained that courts generally lack authority to determine whether another sovereign's failure to abide by the terms of an international agreement relieved the United States of any corresponding obligations. 459 F.2d at 1220–21. We then recognized a qualification—that courts must enforce self-executing treaties affecting individual rights. *Id.* at 1221–22. But, we continued,

the qualification does not apply "when the corrective machinery specified in the treaty itself is nonjudicial." *Id.* at 1222; *see also id.* ("intervention by an American court … is foreclosed by the very terms of the document from which the rights insisted upon are said to spring"). *Holmes* nowhere suggests that courts lack jurisdiction to adjudicate any claims involving non-self-executing agreements. And as explained above, adjudicating the claims at issue here would not require United States courts to pass judgment on the public acts of a foreign sovereign. Moreover, after *Holmes* was decided, we squarely held that the question of self-execution "does not present a jurisdictional issue regarding the court's power to hear a case" and instead relates to a merits question whether the "plaintiff has a cause of action." *Sluss v. U.S. Dep't of Justice, Int'l Prisoner Transfer Unit*, 898 F.3d 1242, 1248 (D.C. Cir. 2018). So if claims fail because an international agreement is not self-executing, the result should be a merits dismissal rather than application of the political question doctrine.

## III

For their cause of action, the plaintiffs invoke the APA's judicial-review provisions, 5 U.S.C. §§ 701–06. Those provisions create a right of review for any person adversely affected by agency action, *id.* § 702, which extends to final agency action not otherwise reviewable, *id.* § 704. But this review is unavailable if "statutes preclude judicial review," *id.* § 701(a)(1), or if the action for which review is sought is "committed to agency discretion by law," *id.* § 701(a)(2). Because the latter exclusion applies to this case, the plaintiffs have no APA cause of action.

Section 701(a)(2) governs in two related circumstances. First, a matter is "committed to agency discretion by law" if the governing statute "is drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). Second, section 701(a)(2) makes presumptively unreviewable certain decisions "traditionally left to agency discretion," such as decisions not to bring enforcement actions or not to grant reconsideration. *Id.* But even for traditionally unreviewable decisions, if Congress limits agency discretion "by putting restrictions in the operative statutes," the exception may not apply. *Id.* at 193; *see Chaney*, 470 U.S. at 833 (considering whether a statute "supplied sufficient standards to rebut the presumption of unreviewability").

In *Vigil*, the Supreme Court held that an agency's "allocation of funds from a lump-sum appropriation" is another kind of decision that section 701(a)(2) presumptively insulates from review. 508 U.S. at 192. As the Court explained, such allocations have been "traditionally regarded as committed to agency discretion," for "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* The Court thus refused to review the Indian Health Service's decision to discontinue a regional healthcare program and reallocate the funding to a national one. *Id.* at 189. The Court noted that neither the relevant appropriations nor the substantive statutes even mentioned the discontinued program, much less circumscribed the agency's discretion to repurpose its funding. *Id.* at 193–94.

The State Department decisions rejecting the plaintiffs' claims are unreviewable for many of the same reasons. What law might constrain those decisions? Start with section 2668a, which governs the disbursement of settlement funds paid to the United States by foreign governments. Section 2668a provides

that the Secretary of State "shall determine the amounts due claimants" from such funds, and it prospectively makes appropriations to pay "the ascertained beneficiaries." It thus charges the Secretary with deciding how to allocate a fixed sum of appropriated money among claimants, and *Vigil* teaches that the "allocation of funds from a lump-sum appropriation" is presumptively "committed to agency discretion." 508 U.S. at 192. Nor does section 2668a overcome the presumption by restricting agency discretion. Nothing in it directs the Secretary to allocate funds in any particular way—it just requires him to "determine the amounts due."

Next consider the Agreement. Article 6 requires the United States to distribute the $60 million fund "according to criteria which it shall determine." J.A. 18. And Article 8 states that "[a]ny dispute arising out of the interpretation or performance of this Agreement shall be settled exclusively by way of consultation between" France and the United States. J.A. 19. The Agreement thus is not self-executing. *See Medellín*, 552 U.S. at 508–09. And because it is not self-executing, it does not "function as binding federal law," and it "can only be enforced" domestically through implementing legislation. *Id.* at 504–05 (cleaned up). We recognized this basic point in *Citizens in Nicaragua*, which held that the APA "does not grant judicial review of agencies' compliance with a legal norm that is not otherwise an operative part of domestic law." 859 F.2d at 943.

The plaintiffs do not argue that the Agreement itself has domestic legal force. Instead, they contend that section 2668a incorporates the Agreement as binding domestic law. They invoke *Sluss*, where a statute directed an agency to look to a non-self-executing treaty "for substantive direction." 898 F.3d at 1251. We held that the statute implemented and incorporated the treaty, thereby domesticating its provisions

and making agency action under the treaty reviewable through the APA. *Id.* at 1251–52. We are skeptical that section 2668a does comparable work here. As discussed, it merely requires the Secretary of State to determine amounts due to claimants, authorizes the Secretary of the Treasury to disburse those amounts, and provides a standing appropriation. This implements the Agreement in the limited sense of allowing the United States to pay claimants consistent with the Appropriations Clause. *See* U.S. Const. art. I, § 9, cl. 7. But section 2668a neither requires the Secretary of State to apply the substantive standards of the Agreement nor itself provides any substantive standards.

In any event, domestication of the Agreement would not help the plaintiffs. They contend that Article 6, which requires the United States to "consider the objectives of this Agreement" and to "rely on the sworn statement[s]" of the claimants, would provide standards firm enough to support APA review. J.A. 18. We need not decide this question because the plaintiffs' theory would also domesticate Article 8, which requires interpretive and enforcement disputes to be "settled exclusively by way of consultation between the Parties." J.A. 19. In that case, the statute domesticating the Agreement would itself preclude review. *See* 5 U.S.C. § 701(a)(1). The plaintiffs object that Article 8 governs only disputes between the United States and France, as opposed to disputes between individual claimants and the State Department. But by its terms, Article 8 applies to "[a]ny dispute arising out of the interpretation or performance of this Agreement." J.A. 19. And try as the plaintiffs might to characterize their claims as arising solely under the APA, the only possible source of substantive law for their claims is the Agreement itself, which bars judicial review expressly.

For these reasons, the APA gives the plaintiffs no cause of action to challenge the State Department's decisions rejecting their claims under the Agreement.

IV

The district courts in *Schieber* and *Faktor* correctly concluded that the plaintiffs there failed to state a claim. The district courts in *Gutrejman*, *Schneider*, and *Bywalski* erred in dismissing the claims at issue on jurisdictional grounds, but we affirm on the alternative ground that these plaintiffs failed to state a claim.[2]

*Affirmed.*

---

[2] Because the government filed cross-appeals to support its merits arguments in these three cases, we need not consider whether this Court otherwise could have converted the jurisdictional rulings below into merits ones. *See Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1028–29 (D.C. Cir. 2020); *Sierra Club*, 648 F.3d at 854.